1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  BRIANNA M. BROOKS,
    individually and as successor-
12  in-interest to Decedent DENNIS
    BROOKS; et al.,
13                                        NO. 2:09-cv-03343-MCE-GGH
              Plaintiffs,
14
        v.                               MEMORANDUM AND ORDER
15
    COUNTY OF SAN JOAQUIN, a
16  municipal corporation; et al.,

17
              Defendants.
18

19                        ----oo0oo----

20

21      Through the present lawsuit, Plaintiffs seek redress under

22  both 42 U.S.C. § 1983 and state law for the suicide of their

23  father, Dennis Brooks, while Brooks was a pretrial detainee at

24  the San Joaquin County Jail (hereinafter "jail").  Named

25  Defendants include San Joaquin County and Sheriff Steve Moore, in

26  his capacity as San Joaquin County Sheriff.

27  ///

28  ///

                             1

1  Certain correctional officers who were involved with Brooks'
2  detention at the jail have also been sued, both in their official
3  and individual capacities, including Defendants Kevin Casanelli,
4  Angelo Hurtado-Askins, Mark Hughes, Octavio Samaniego, and Ralph
5  Huggins.   Presently before the Court are cross-motions for
6  summary judgment.   Defendants request summary judgment as to
7  Plaintiffs' claims in their entirety.   Plaintiffs' motion, while
8  also seeking summary judgment, asks in the alternative that
9  summary adjudication be granted as to various individual claims.
10 As set forth below, Defendants' motion will be granted in part,
11 granted in part and Plaintiff's Motion will be denied.

12
13                              **BACKGROUND**
14

15      On November 20, 2008, at approximately 10:30 p.m., Decedent
16 Dennis Brooks, a transient, broke into the house of his ex-wife,
17 Brenda Clow-Brooks, after his daughter, Plaintiff Brianna Brooks,
18 refused to allow Dennis Brooks entry to the residence.   Brianna
19 Brooks called law enforcement.   Stockton police officers
20 thereafter placed Dennis Brooks under arrest and transported him
21 by squad car to the San Joaquin County Jail.

22      Defendant Kevin Casanelli conducted Dennis Brooks'
23 pre-booking interview upon his arrival at the jail at
24 approximately 12:30 a.m. on the morning of November 21, 2008.
25 Brooks told Casanelli, a correctional officer, that while he was
26 not currently thinking about suicide, he had a history of
27 suicidal ideation and attempted suicide and was, as a result,
28 under psychiatric care.

                                2

Plaintiff's Undisputed Fact ("PUF") No. 36.  Brooks also told
Defendant Casanelli that he was taking Seroquel, a medication
known by Casanelli to be a psychotropic in nature.  Brooks
further admitted to Casanelli that he was under the influence of
heroin, and Casanelli recognized Brooks from a prior
incarceration at the jail where he was placed in the sheltered
housing unit.  Id. at 39-40.  Sheltered housing is reserved for
inmates and/or psychiatric patients who need closer monitoring
than that afforded to the general jail population.

     As the pre-booking officer, Casanelli input the information
provided by Brooks, as well as his own observations, into a
computerized custody information system known as CUSINS.  Because
of his heroin addiction, Brooks was seen by medical staff, where
he again denied any current suicidal ideation.  Defendants'
Undisputed Fact ("DUF") No. 8.

     After being seen by medical staff, Brooks' housing
classification was assessed by another correctional officer,
Defendant Ralph Huggins.  Id. at 9.  As a classifications
officer, Huggins had access to information contained in both the
CUSINS database and in the so-called booking process system, or
CJIS.  Despite Brooks' prior history, Huggins determined that he
had no psychological impairment, explaining that a prior history
of suicidal ideation is insufficient in and of itself to warrant
contacting psychological staff.  Huggins Dep., 87:25-89:4, Ex. A
to Opening Decl. of Benjamin Nisenbaum.  According to Huggins,
Brooks denied any ongoing suicidal thoughts, or even being under
a psychiatrist's care at the time of his face-to-face
classification interview.  See id. at 87:2-8.

That information directly contradicted what Brooks told Defendant
Casanelli earlier.

Although Huggins indicated he did not know whether Brooks
was under the influence of heroin, he assigned him to housing in
so-called administrative segregation.  DUF at 50-51.  Huggins did
not request any further psychiatric evaluation.  Administrative
segregation places inmates who require more supervision than
those in the general population into individual cells where they
are supposed to be checked at 30-minute intervals.  Id. at 8.
Huggins claimed he did not know that Brooks had told Casanelli
that he was currently under the care of a doctor and taking
medication for suicidal thoughts.  He admitted that he could have
checked the CUSINS database for information to that effect input
by Defendant Casanelli but apparently did not do so.  Huggins
Dep., 90:22-92:21.

Defendants Hughes and Hurtado-Askins were both assigned to
the administration segregation unit during the day shift on
November 21, 2008.  Neither had been involved in Brooks'
pre-booking, booking or classification, and neither was aware of
Brooks' suicidal history.  DUF No. 20, PUF No. 61.  Their
required 30-minute rounds involved checking on the ad-seg inmates
and using a computerized device that recorded the timing of each
round.  At 1:15 p.m., during one of his rounds, Hughes observed
Brooks hanging from the sprinkler head in his cell by a bed
sheet.  Id. at 61.  Hughes radioed for help, entered Brooks' cell
and cut his body down with a utility knife.  Defendants Hurtado-
Askins and Samaniego thereafter responded and performed CPR until
the nurse and other emergency personnel arrived.  Id. at 69-71.

4

1    Both Hurtado-Askins and Hughes deny noticing anything
2 unusual about Brooks' demeanor prior to his death.  They deny
3 that Brooks expressed any suicidal thoughts, or that he was
4 yelling or banging on his cell door.  DUF No. 31-32, 38.  One
5 inmate, however, did allegedly write a letter reporting that
6 Brooks had been banging on his cell door and threatening suicide.
7 See DUF No. 50-55.  That same inmate, Thomas Welles, claims that
8 Defendant Hughes had heard those threats about an hour prior to
9 Brooks' suicide but did nothing other than to tell Brooks to back
10 away from his cell door.  Welles Dep., 26:8-22, 27:16-20. Ex. C
11 to the Opp'n/Reply Decl. of Benjamin Nisenbaum.

12    The County Coroner determined Brooks' cause of death to be
13 due to asphyxiation, consistent with hanging by the neck.
14 Brooks' suicide was the third in-custody suicide at the jail
15 since 2004.  All three suicides were by hanging.  PUF Nos. 73-74.

16    Plaintiffs filed the present wrongful death claim on
17 December 1, 2009.  In addition to four causes of action based
18 explicitly on 42 U.S.C. § 1983 (for wrongful death based on
19 Defendants' deliberate indifference to Brooks' serious
20 medical/mental health needs), for loss of familial relations, for
21 so-called Monell liability, and for successor-in-interest civil
22 rights liability), Plaintiffs also allege three claims premised
23 on California law, including wrongful death/negligence in
24 violation of California Code of Civil Procedure §§ 377.60 and
25 377.61, for failure to provide equal accommodations under
26 California Civil Code § 52.1, and for negligent hiring,
27 retention, supervision and discipline against Defendants County
28 and Moore.

Plaintiffs now move for summary adjudication as to their deliberate
indifference, negligence, Monell, and familial association
claims.   Defendants move for summary judgment as to the case in
its entirety.   Consequently, Defendants do not seek dismissal of
individual claims by way of summary adjudication, although they
do seek wholesale dismissal of certain defendants on grounds that
no viable claims have been asserted against those defendants.

## STANDARD

The Federal Rules of Civil Procedure provide for summary
judgment when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law."   Fed. R. Civ. P. 56(c).   One of the
principal purposes of Rule 56 is to dispose of factually
unsupported claims or defenses.   Celotex Corp. v. Catrett,
477 U.S. 317, 325 (1986).

The standard that applies to a motion for summary
adjudication is the same as that which applies to a motion for
summary judgment.   See Fed. R. Civ. P. 56(a), 56(c); Mora v.
ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing
> the district court of the basis for its motion, and
> identifying those portions of 'the pleadings, depositions,
> answers to interrogatories, and admissions on file
> together with the affidavits, if any,' which it
> believes demonstrate the absence of a genuine issue of
> material fact.

1   Celotex Corp. v. Catrett, 477 U.S. at 323 (quoting Rule 56(c)).

2        If the moving party meets its initial responsibility, the
3   burden then shifts to the opposing party to establish that a
4   genuine issue as to any material fact actually does exist.
5   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
6   585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
7   253, 288-89 (1968).

8        In attempting to establish the existence of this factual
9   dispute, the opposing party must tender evidence of specific
10  facts in the form of affidavits, and/or admissible discovery
11  material, in support of its contention that the dispute exists.
12  Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that
13  the fact in contention is material, i.e., a fact that might
14  affect the outcome of the suit under the governing law, and that
15  the dispute is genuine, i.e., the evidence is such that a
16  reasonable jury could return a verdict for the nonmoving party.
17  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52
18  (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper
19  Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way,
20  "before the evidence is left to the jury, there is a preliminary
21  question for the judge, not whether there is literally no
22  evidence, but whether there is any upon which a jury could
23  properly proceed to find a verdict for the party producing it,
24  upon whom the onus of proof is imposed."  Anderson, 477 U.S. at
25  251 (quoting Improvement Co. v. Munson, 14 Wall. 442, 448,
26  20 L. Ed. 867 (1872)).

27  ///

28  ///

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A.   Deliberate Indifference**

A pretrial detainee like Dennis Brooks is entitled to be free of cruel and unusual punishment under the Due Process Clause of the Fourteenth Amendment. Bell v. Wolfish, 441 U.S. 520, 537 n.16 (1979); Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).  The Due Process Clause requires that "persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs."

1  _Gibson v. County of Washoe, Nev._, 290 F.3d 1175, 1187 (9th Cir.

2  2002) (quoting _Carnell v. Grimm_, 74 F.3d 977, 979 (9th Cir.

3  1996)).[1]  The deliberate indifference standard has been

4  specifically applied to inmates' suicide prevention.

5  _Clouthier v. County of Contra Costa_, 591 F.3d 1232, 1241

6  (9th Cir. 2010).

7      A pretrial detainee's due process right to adequate care is

8  violated when a jailer fails to promptly and reasonably procure

9  competent medical aid when the pretrial detainee suffers a

10  serious illness or injury while confined.  _Estelle v. Gamble_,

11  429 U.S. 97, 104-105 (1976).  "The indifference to medical needs

12  must be substantial; a constitutional violation is not

13  established by negligence or 'an inadvertent failure to provide

14  adequate medical care.'"  _Anderson v. County of Kern_, 45 F.3d

15  1310, 1316 (9th Cir. 1995) (quoting _Estelle_, 429 U.S. at 105-06).

16  Either inaction or action when an official knows of the requisite

17  serious medical need is enough to support liability.  _Farmer v._

18  _Brennan_, 511 U.S. 825, 842 (1994).

19      In order to establish a plausible claim for failure to

20  provide medical treatment, Plaintiff must plead sufficient facts

21  to permit the Court to infer that (1) Plaintiff had a "serious

22  medical need," and that (2) individual Defendants were

23  "deliberately indifferent" to that need.

24  ///

25

26      [1] Although technically convicted inmates' rights to
constitutionally adequate medical care are analyzed under the

27  Eighth Amendment, the standard for determining whether deliberate
indifference has occurred is the same for both convicted inmates

28  and pretrial detainees, like Dennis Brooks herein.  _See_, _e.g._,
_Frost v. Agnos_, 152 F.3d 1124, 1128 (9th Cir. 1998).

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); Farmer v.
Brennan, 511 U.S. at 834, 837.  A defendant is not deliberately
indifferent unless he was subjectively aware of the serious
medical need yet failed to adequately respond.  Simmons v. Navajo
County, 609 F.3d 1011, 1017-18 (9th Cir. 2010).  Consequently,
there is both an objective component in determining whether a
serious medical need existed and a subjective determination as to
whether a prison official has a sufficiently culpable state of
mind.  Clouthier, 591 F.3d at 1242.

Although the subjective component requires that a defendant
be aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and actually draw that
inference (Farmer, 511 U.S. at 837), a plaintiff "need not show
that a prison official acted or failed to act believing that harm
actually would befall on inmate; it is enough that the official
acted or failed to act despite his knowledge of a substantial
risk of serious harm."  Id. at 842.  "Whether a prison official
had the requisite knowledge of a substantial risk is a question
of fact subject to demonstration in the usual ways, including
inference from circumstantial evidence, . . . and a fact finder
may conclude that a prison official knew of a substantial risk
from the very fact that the risk was obvious."  Id. (emphasis
added) (internal citations omitted); see also Lolli v. County of
Orange, 351 F.3d 410, 421 (9th Cir. 2003) ("Much like
recklessness in criminal law, deliberate indifference to medical
needs may be shown by circumstantial evidence when the facts are
sufficient to demonstrate that a defendant actually knew of a
risk of harm.").

1    With this legal framework in mind, we turn to the factual

2  circumstances surrounding the particular Defendants sued by

3  Plaintiffs herein.  As enumerated above, Defendant Casanelli knew

4  that Dennis Brooks was under a doctor's care for ongoing suicidal

5  ideation and was using psychotropic drugs because of his issues

6  in that regard.  Nonetheless, he failed to notify psychiatric

7  staff, despite the fact that he was required to do when

8  confronted with knowledge that an inmate was taking psychotropic

9  medications.  PUF No. 16.  This shortcoming was further

10  exacerbated by Casanelli's knowledge that Brooks abused both

11  alcohol and heroin.  Indeed, Casanelli's notes appear to indicate

12  that Brooks had last used heroin three hours previously and

13  consumed two fifths of hard liquor on a daily basis.  See Medical

14  Screen Questionnaire, Ex. A. to the Opp'n/Reply Decl. of Benjamin

15  Nisenbaum, Bates-stamp p. 457.  Although a nurse was contacted

16  for heroin protocol, there is no indication that staff was

17  alerted by Casanelli to the danger implicit in a withdrawal from

18  both heroin and alcohol combined with Brooks' use of psychotropic

19  medication and ongoing suicidal thoughts.  This was particularly

20  critical because, as Defendants' own Mental Health Suicide

21  Prevention Plan recognizes, the first mentioned high suicide

22  risks in jail are related to intoxication/substance withdrawal

23  and to the first 24-hour period of confinement.  Id. at p. 2242.

24    That Brooks had a serious medical need given his ongoing

25  suicidal ideation, his treatment for same, and his substance

26  abuse would appear virtually uncontroverted.

27  ///

28  ///

11

1   Moreover, under these circumstances, there plainly is a triable

2   issue of fact with respect to whether Casanelli knew that Dennis

3   Brooks was an excessive suicide risk, yet failed to take adequate

4   steps to protect him in the face of that risk.  Simply entering

5   the information provided by Brooks into the CUSINS database,

6   without taking any further action as required by jail policy, may

7   well be enough for a trier of fact to determine that Casanelli

8   was deliberately indifferent.  Consequently, Defendants' motion

9   seeking to defeat any liability on Casanelli's behalf for

10  deliberate indifference must fail.  At the same time, however,

11  given Brooks' own denial of any current suicidal ideation,

12  however, the Court also cannot affirmatively find as a matter of

13  law that Casanelli was deliberately indifferent.  That

14  determination involves similar issues of fact that a jury must

15  ultimately determine.[2]

16  ///

17  ///

18

19      [2] While Defendants claim the Ninth Circuit's recent decision
    in Clouthier v. County of Contra Costa, 591 F.3d 1232 (9th Cir.
20  2010) is controlling on the issue of whether the facts of this
    matter give rise to potential deliberate indifference liability,
21  the Court does not view Clouthier as dispositive.  In Clouthier,
    summary judgment was upheld as to a correctional deputy, Steele,
22  who knew simply that the inmate had been in an observation room
    earlier in the week for being a danger to himself, and who did
23  not appear suicidal to Steele when he transferred Clouthier into
    the general prison population.  That scenario contrasts with the
24  facts of the present case, where Casanelli knew that Brooks
    continued to be actively treated for suicidal ideation, was
25  currently taking psychotropic drugs, and was abusing both alcohol
    and heroin.  Moreover, with respect to a mental health
26  specialist, Blush, who did have direct knowledge that Clouthier
    continued to pose a serious risk of harming himself, the
27  Clouthier court overturned the district court's grant of summary
    judgment in favor of Blush.  If anything, the facts of the
28  present case with respect to Casanelli are more akin to Blush's
    involvement in Clouthier than to Steele's.

1    Although the facts with respect to Defendant Huggins'
2  potential liability would appear, on their face, less egregious,
3  they also raise triable issues of fact not amenable to summary
4  judgment.  Huggins, as the housing classification officer, had
5  access to the information Casanelli had generated, but still
6  failed to place Brooks into a sheltered housing environment where
7  the constellation of factors placing him at a high risk of
8  suicide could more adequately be monitored.  That shortcoming
9  also raises triable issues not suited to summary judgment,
10 particularly since Huggins reviewed Brooks' previous custody
11 history and learned that Brooks had earlier been housed in a
12 safety cell for suicidal ideation.  See Huggins Dep., 52:8-16.
13     Turning to Defendant Mark Hughes, as indicated above, Hughes
14 was one of the officers responsible for periodic cell checks
15 during the hours preceding Brooks' suicide.  One inmate, Thomas
16 Welles, claims that Brooks, shortly before his death, was banging
17 on his jail cell and threatening to kill himself.  Welles claims
18 that Hughes observed that conduct and simply told Brooks to back
19 away from his cell door and quiet down.  See Welles Dep.,
20 22:426:17; 43:20-44:10.  Although Welles' testimony in that
21 regard may well be questionable given the apparent failure of any
22 other inmate to notice any suicidal behavior on Brooks' part, it
23 still raises a triable issue as to Hughes' liability that
24 preclude summary judgment.  If a jury were to accept Welles'
25 version of events, it could unquestionably find Hughes
26 deliberately indifferent to Brooks' serious medical needs under
27 the circumstances.
28 ///

13

1     Plaintiffs offer no opposition to the remaining named

2 individual defendants in this matter, including Officers

3 Samaniego and Hurtado-Askins, and Sheriff Steve Moore.  Samaniego

4 had no contact with Dennis Brooks before responding to his cell

5 after Brooks was found hanging.  There similarly is no contention

6 that Hurtado-Askins noticed anything amiss in her observation

7 rounds checking on Brooks and other inmates prior to Brooks'

8 death.  Finally, with regard to Sheriff Moore, liability under

9 42 U.S.C. § 1983 has be premised on a showing of personal

10 participation in the alleged civil rights violation, since there

11 is no respondeat superior liability under § 1983 for the conduct

12 of the officers Moore was responsible for supervising.  See

13 Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  No

14 evidence of any such personal participation on Moore's part has

15 been offered, and, as indicated above, Plaintiffs are clear in

16 not opposing summary judgment as to either Moore, Hurtado-Askins,

17 or Samaniego.  See Pls.' Opp'n, 17:23-24 ("Defendants' Motion

18 must be denied as to defendants COUNTY, CASANELLI, HUGGINS, AND

19 HUGHES.")

20

21     **B.    <u>Monell</u> Liability**

22

23     Deliberate indifference can be inferred through an

24 established practice or custom that violates a prisoner's rights.

25 Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003).  In

26 order to establish liability under 42 U.S.C. § 1983, a local

27 government's policy or practice must be the "moving force of the

28 constitutional violation."

14

1  <u>Polk County v. Dodson</u>, 454 U.S. 312, 326 (1981) (citing the

2  seminal case of <u>Monell v. New York City Dept. of Social Servs.</u>,

3  436 U.S. 658, 694 (1978)).  The lack of needed policy can suffice

4  where the lack of adequate training and/or procedures is "so

5  obvious, and the inadequacy so likely to result in the violation

6  of constitutional rights, that the policy makers of the city can

7  reasonably be said to have been deliberately indifferent to the

8  need."  <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 (1989).  In

9  that event, as the Supreme Court notes, "the failure to provide

10  proper training may fairly be said to represent a policy for

11  which [the governmental entity] is responsible, and for which

12  [it] may be liable if it actually causes injury."  <u>Id.</u>

13       Plaintiffs argue that Defendant County has a policy of

14  disregarding an inmate's past housing and level classification in

15  determining their current classification.  That policy, according

16  to Plaintiffs, put vulnerable inmates like Dennis Brooks at risk,

17  and did so in this case by Defendant Huggins' failure to consider

18  Brooks' prior placement in sheltered housing.  Plaintiffs further

19  argue that the manner in which the jail databases are used, or

20  not used, also constitutes an actionable policy decision.  In

21  this case, despite Defendant Casanelli's input of information

22  into the system as a result of his pre-booking interview, much of

23  that information was apparently not accessed by Defendant Huggins

24  in his classification determination.  Finally, Plaintiffs contend

25  that the County's failure to discipline Casanelli and Huggins for

26  not notifying psych staff about Brook's suicidal ideation and

27  medication (apparently in violation of County policy) also

28  represent an implicit ratification of those practices.

1   All these shortcomings, according to Plaintiffs, thus give rise

2   to potential <u>Monell</u> liability against Defendant County.

3   Plaintiffs' correctional practices expert, Joel Goodman, supports

4   that contention,[3] and points out that Brooks' suicide is the

5   third successful suicide by hanging in the San Joaquin County

6   Jail since 2004, a factor which may also be significant in

7   suggesting the lack of appropriate safeguards against suicide.

8         Like Plaintiffs' deliberate indifference allegations as

9   discussed above, Plaintiff's municipal liability claims premised

10  on <u>Monell</u> violations also raise numerous triable issues not

11  amenable to disposition through summary judgment.  While Brooks'

12  alleged repeated denial of current suicidal ideation may well

13  figure into the calculus of whether his care was indeed adequate

14  under the circumstances (therefore mitigating against any sort of

15  explicit or implicit policy endangering Brooks), that simply is

16  not a decision this Court can make as a matter of law on the

17  record before it.

18

19  **C.    Qualified Immunity**

20

21        The individual defendants in this matter argue that even if

22  Brooks' constitutional rights were in fact violated as alleged by

23  Plaintiffs, they are nonetheless entitled to qualified immunity.

24  ///

25  ///

26  ────────────────────

27        [3] The Court recognizes that Defendants have separately moved
    to disqualify Joel Goodman as an expert in this matter.  That
28  Motion to Strike (ECF No. 39) will be addressed by separate
    Order.

1   "The doctrine of qualified immunity protects government officials

2   from liability for civil damages insofar as their conduct does

3   not violate clearly established statutory or constitutional

4   rights of which a reasonable person would have known."

5   Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v.

6   Fitzgerald, 457 U.S. 800, 818 (1982).  In considering a claim of

7   qualified immunity, this Court must determine "whether the facts

8   that a plaintiff has alleged... make out a violation of a

9   constitutional right" and "whether the right at issue was

10  'clearly established at the time of Defendants' alleged

11  misconduct."  Id. at 232.  Whether a right is clearly established

12  turns on the "objective legal reasonableness of the action,

13  assessed in light of the legal rules that were clearly

14  established at the time it was taken."  Id. at 244 (quoting

15  Wilson v. Layne, 526 U.S. 603, 614 (1999).

16      In arguing for qualified immunity, Defendants first argue

17  that "no reasonable jury could find that the individual

18  defendants were aware any alleged suicidal intent by Brooks such

19  that they were on notice that he intended to commit suicide, and

20  therefore there was no constitutional violation."  Defs.' Opening

21  Mem., 12:12-14.  As set forth above, the Court has already

22  rejected that contention.  Moreover, to the extent that

23  Plaintiffs have raised a triable issue as to deliberate

24  indifference in the face of information concerning Brooks'

25  potential suicidality, Defendants cannot realistically argue that

26  a reasonable deputy would have been unaware of his or her duty to

27  protect Brooks against that risk, or that Brooks' right to such

28  protection was not clearly established.

**CONCLUSION**

For all the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 34) is GRANTED as to Defendants Angela Hurtado-Askins, Octavio Samaniego and Steve Moore, but otherwise DENIED as to the remaining Defendants, County of San Joaquin, Kevin Casanelli, Ralph Huggins and Mark Hughes. As set forth above, viable claims as to Casanelli, Huggins and Hughes premised on deliberate indifference preclude summary judgment, and Plaintiffs have similarly stated an actionable claim against the County for so-called <u>Monell</u> liability. Defendants' Motion for Summary Judgment as against Casanelli, Huggins, Hughes and the County of San Joaquin, which by definition seek disposition of claims against those defendants in their entirety, must therefore be DENIED.

///
///
///
///
///
///
///
///
///
///
///
///
///

18

1     Plaintiffs' Motion for Summary Judgment (ECF No. 31) is also

2  DENIED.[4]  As also set forth above, triable issues remain as to

3  Defendants' liability for deliberate indifference, and while

4  Plaintiffs seek summary adjudication as to other related claims

5  as well, the viability of those claims depends on the same

6  factual considerations which preclude judgment as a matter of law

7  as to Plaintiffs' deliberate indifference claims.[5]

8     IT IS SO ORDERED.

9
   Dated: April 27, 2012
10

11                                    _____
12                                    MORRISON C. ENGLAND, JR.
                                      UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20

21

22
   _____

23     [4] Because oral argument was not of material assistance, the
24  Court ordered this matter submitted on the briefs in accordance
    with E.D. Local Rule 230(g).
25
       [5] Plaintiffs' negligence claims, for example, are premised
26  on Defendants' allegedly wrongful failure to summon psych staff
    in response to Dennis Brooks' presenting circumstances.
27  Similarly, Plaintiff's right to familial association claim is
    also based on predicate deliberate indifference violations.  In
28  both instances, the same factual inquiry precluding summary
    judgment must be applied.

                                   19